14-121-cv
*Harrison v. Republic of Sudan*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2014

(Argued:     January 5, 2015          Decided:     September 23, 2015)

Docket No. 14-121-cv

RICK HARRISON, JOHN BUCKLEY, III, MARGARET LOPEZ, ANDY LOPEZ, KEITH
LORENSEN, LISA LORENSEN, EDWARD LOVE, ROBERT MCTUREOUS, DAVID MORALES,
GINA MORRIS, MARTIN SONGER, JR., SHELLY SONGER, JEREMY STEWART, KESHA
STIDHAM, AARON TONEY, ERIC WILLIAMS, CARL WINGATE, TRACEY SMITH, as
personal representative of the Estate of Rubin Smith,

*Plaintiffs-Appellees,*

v.

REPUBLIC OF SUDAN,

*Defendant-Appellant,*

ADVANCED CHEMICAL WORKS, AKA Advanced Commercial and Chemical Works
Company Limited, AKA Advanced Training and Chemical Works Company
Limited, Accounts & Electronics Equipments, AKA Accounts and Electronics
Equipments, et al.,

*Defendants,*

NATIONAL BANK OF EGYPT, CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK,

*Respondents.*\*

On Appeal from the United States District Court
for the Southern District of New York

Before:

LYNCH and CHIN, *Circuit Judges*,
and KORMAN, *District Judge.*\*\*

Appeal from three orders of the United States District Court for the

Southern District of New York (Torres, *J.*), requiring respondent banks holding

assets of defendant-appellant Republic of Sudan to turn over funds to satisfy an

underlying default judgment obtained by plaintiffs-appellees against the

Republic of Sudan in the United States District Court for the District of

Columbia. The Republic of Sudan contends that (1) service of process did not

comply with the Foreign Sovereign Immunities Act, and (2) the District Court

erred by attaching assets of a foreign state to satisfy a judgment under the

---

\*        The Clerk of Court is respectfully requested to amend the caption as set forth above.

\*\*        The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

Terrorism Risk Insurance Act without authorization from the Office of Foreign Assets Control or a Statement of Interest from the Department of Justice.

AFFIRMED.

_____

ANDREW C. HALL (Brandon Levitt, *on the brief*), Hall, Lamb and Hall, P.A., Miami, Florida, *for Plaintiffs-Appellees*.

ASIM GHAFOOR, Law Office of Asim Ghafoor, Washington, D.C., *for Defendant-Appellant*.

_____

CHIN, *Circuit Judge*:

On October 12, 2000, an explosive-laden skiff pulled up alongside the U.S.S. Cole, which was docked for refueling at the port of Aden, Yemen, and detonated.  Seventeen U.S. Navy sailors were killed in the attack, and forty-two wounded.  Fifteen of the injured sailors and three of their spouses brought suit in 2010 in the United States District Court for the District of Columbia (the "D.C. District Court") under the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.*, alleging that al Qaeda was responsible for the attack and that the Republic of Sudan ("Sudan") had provided material support to al

Qaeda. In 2012, the D.C. District Court entered a default judgment against Sudan in the amount of $314,705,896.

Plaintiffs registered the default judgment in the United States District Court for the Southern District of New York, and then sought to enforce it against funds held by New York banks. The District Court below (Torres, *J.*) issued the three turnover orders before us.

We hold that (1) service of process on the Sudanese Minister of Foreign Affairs via the Sudanese Embassy in Washington, D.C., complied with the FSIA's requirement that service be sent to the head of the ministry of foreign affairs, and (2) the District Court did not err in issuing the turnover orders without first obtaining either a license from the Treasury Department's Office of Foreign Assets Control ("OFAC") or a Statement of Interest from the Department of Justice ("DOJ").

We affirm.

*STATEMENT OF THE CASE*

Plaintiffs-appellants are sailors and spouses of sailors injured in the bombing of the U.S.S. Cole, who brought suit against Sudan in the D.C. District Court on October 4, 2010, under 28 U.S.C. § 1605A, the terrorism exception to the

FSIA, alleging that Sudan provided material support to al Qaeda, whose operatives perpetrated the attack on the vessel.[1]

Pursuant to 28 U.S.C. § 1608(a)(3), plaintiffs filed an Affidavit Requesting Foreign Mailing on November 5, 2010, asking that the Clerk of Court mail the summons and complaint via registered mail, return receipt requested, to:

> Republic of Sudan
> Deng Alor Koul
> Minister of Foreign Affairs
> Embassy of the Republic of Sudan
> 2210 Massachusetts Avenue NW
> Washington, DC 2008

S. App. at 66. As represented by plaintiffs, Deng Alor Koul was the Minister of Foreign Affairs of Sudan at the time.

On November 17, 2010, the Clerk of Court entered a Certificate of Mailing certifying that the summons and complaint were sent via domestic certified mail to the "head of the ministry of foreign affairs," at the Sudanese Embassy in Washington, D.C., *id.* at 67, and that the return receipt was returned to the Clerk of Court and received on November 23, 2010. No attempt was made to serve Sudan at the Ministry of Foreign Affairs in Khartoum, the capital. Sudan

---

[1] One of the sailors died after the suit was brought. His spouse, as representative of his estate, was substituted into the action.

failed to serve an answer or other responsive pleading within sixty days after plaintiffs' service, *see* 28 U.S.C. § 1608(d), and the Clerk of Court thus entered a default against Sudan.

On March 30, 2012, after a hearing, the D.C. District Court (Lamberth, *J.*) entered a default judgment against Sudan in the amount of $314,705,896, *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 51 (D.D.C. 2012), and found, *inter alia*, that service on Sudan had been proper, *id.* at 28.[2] Following entry of the default judgment, plaintiffs filed a second Affidavit Requesting Foreign Mailing, requesting the Clerk to mail notice, this time of the Order and Judgment and the Memorandum Opinion entered by the D.C. District Court, by registered mail, return receipt requested. The Clerk certified in April 2012 that the documents had been mailed to Sudan's Minister of Foreign Affairs via the Sudanese Embassy in Washington, D.C. Sudan again failed to appear or contest the judgment.

On October 2, 2012, plaintiffs registered the judgment in the Southern District of New York, seeking to execute against respondent banks

---

[2] After oral argument in the instant appeal, Sudan made a Rule 60(b) motion in the D.C. District Court to set aside the default judgment. *Harrison v. Republic of Sudan*, No. 10-CV-1689 (D.D.C. June 14, 2015) (Docket No. 55). Sudan moved to hold this appeal in abeyance pending resolution of the motion for vacatur. We deny the motion.

holding Sudanese assets frozen pursuant to the Sudan Sanctions Regulations, *see* 31 C.F.R. Part 538, and on May 9, 2013, plaintiffs filed a Notice of Pending Action.

On June 28, 2013, following a motion by plaintiffs, the D.C. District Court entered an order finding that post-judgment service had been effectuated, and that sufficient time had elapsed following the entry of judgment and the giving of notice of such judgment to seek attachment and execution, pursuant to 28 U.S.C. § 1610(c).[3] On September 20, 2013, the district court below entered a similar order, finding both that sufficient time had passed since entry of the default judgment, and that service of the default judgment had been properly effectuated. Sudan failed to challenge these orders.

Plaintiffs then filed a series of petitions in the Southern District seeking turnover of Sudanese assets, including against Mashreqbank, BNP Paribas, and Credit Agricole Corporate and Investment Bank. The District Court granted the petitions, issuing turnover orders on December 12, 2013, December 13, 2013, and January 6, 2014, respectively. Plaintiffs served all three petitions, as

---

[3] Section 1610(c) provides that "[n]o attachment or execution . . . shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter."

well as their § 1610(c) motion, by U.S. mail addressed to Sudan's Minister of

Foreign Affairs -- at that point Ali Ahmed Karti, who had replaced Deng Alor

Koul as represented by plaintiffs -- via the Embassy of Sudan in Washington.

Sudan filed its notice of appearance on January 13, 2014, only after

all three turnover orders were entered by the District Court below. The same

day, Sudan timely appealed.[4]

---

[4]     As a threshold matter, plaintiffs contend that this Court lacks jurisdiction over the December 12, 2013 and December 13, 2013 orders, and that the appeal is timely only with respect to the January 6, 2014 order, because the notice of appeal was not filed until January 14, 2014. Sudan was required to file a notice of appeal "with the district court clerk within 30 days after entry of the judgment or order appealed from," Fed. R. App. P. 4(a)(1)(A), and "the timely filing of a notice of appeal in a civil case is a jurisdictional requirement," *Bowles v. Russell*, 551 U.S. 205, 214 (2007). Sudan did in fact file a notice of appeal on January 13, 2014, the last day for timely filing of an appeal from the earliest order. Though Sudan neglected to manually select the orders it was appealing on ECF, triggering a "filing error" in the docket entry, Docket No. 34, the notice of appeal was accessible on the docket, the notice itself stated in plain language the three orders at issue, and Sudan corrected the electronic error the next day, by filing an otherwise identical order on January 14, 2014. Because there was no ambiguity in Sudan's January 13, 2014 notice of appeal, the appeal is timely as to all three turnover orders. *See Becker v. Montgomery*, 532 U.S. 757, 767 (2001) ("[I]mperfections in noticing an appeal should not be fatal where no genuine doubt exists about who is appealing, from what judgment, to which appellate court."); *see also Contino v. United States*, 535 F.3d 124, 127 (2d Cir. 2008) ("[T]he failure to sign [a notice of appeal] may be remedied after the time period for filing the notice has expired."); *New Phone Co. v. City of New York*, 498 F.3d 127, 131 (2d Cir. 2007) ("Our jurisdiction . . . depends on whether the intent to appeal from that decision is clear on the face of, or can be inferred from, the notices of appeal.").

*DISCUSSION*

Two issues are presented: (a) whether service of process on the Sudanese Minister of Foreign Affairs via the Sudanese Embassy in Washington complied with the requirement of 28 U.S.C. § 1608(a)(3) that service be sent to the head of the ministry of foreign affairs, and (b) whether the District Court erred in issuing turnover orders without first obtaining either an OFAC license or a DOJ Statement of Interest explaining why no OFAC license was required.

**A.      *Service of Process on the Minister of Foreign Affairs***

The FSIA provides the sole means for effecting service of process on a foreign state. *See* 28 U.S.C. § 1608(a); H.R. Rep. No. 94-1487, at 23 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6622 ("Section 1608 sets forth the exclusive procedures with respect to service on . . . a foreign state . . . ."). Four methods of service are prescribed, in descending order of preference. 28 U.S.C. § 1608(a)(1)-(4). Plaintiffs must attempt service by the first method, or determine that it is unavailable, before attempting subsequent methods in the order in which they are laid out.

The first method is service "in accordance with any special arrangement for service between the plaintiff and the foreign state or political

subdivision." *Id.* § 1608(a)(1).  In the absence of such a special arrangement, the statute next permits service "in accordance with an applicable international convention on service of judicial documents."  *Id.* § 1608(a)(2).  If neither of these first two methods is available, plaintiffs may proceed according to the third method, which permits service "by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court *to the head of the ministry of foreign affairs of the foreign state concerned*."  *Id.* § 1608(a)(3) (emphasis added). Finally, the statute provides that if service cannot be made under the first three paragraphs, service is permitted as a last resort "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services -- and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state."  *Id.* § 1608(a)(4).

Here, it is undisputed that service in conformity with the first two methods was unavailable, because plaintiffs have no "special arrangement" for service with Sudan, and because Sudan is not a party to an "international

convention on service of judicial documents." *Id.* §1608(a)(1)-(2). Thus,

§ 1608(a)(3) was the preferred method of service, and plaintiffs effectuated

service in accordance with this paragraph. In the underlying litigation in the

D.C. District Court, the Clerk of Court sent process by U.S. mail, return receipt

requested, to the Minister of Foreign Affairs, Deng Alor Koul, via the Embassy of

Sudan in Washington, D.C.

As an initial matter, plaintiffs complied with the first three clauses of

28 U.S.C. § 1608(a)(3). First, service could not be made under paragraphs (1) or

(2) of § 1608(a). Second, plaintiffs directed the Clerk of Court to include in the

service package a copy of the summons and complaint, and notice of suit, and

the Clerk confirmed that a translation of each was included. And third, plaintiffs

directed the clerk of court to serve Sudan by a "form of mail requiring a signed

receipt," *id.* § 1608(a)(3), and, after the clerk mailed the service package on

November 17, 2010, a return receipt was in fact received on November 23, 2010.[5]

---

[5] At oral argument, counsel for Sudan represented that the Minister of Foreign Affairs did not have actual notice of the underlying suit because at the time of the mailing to the Embassy, Sudan was in the final months of a coalition government with the Sudan People's Liberation Movement, before South Sudan became independent. According to counsel, due to the structure of the power-sharing agreement the Minister of Foreign Affairs would not have received notice from the opposition-controlled Embassy. But on the record before us we can look only at the

On appeal, Sudan argues that service on Sudan's Minister of Foreign Affairs via the Sudanese Embassy in Washington does not comply with the requirement of the final clause of 28 U.S.C. § 1608(a)(3), that service be sent "to the head of the ministry of foreign affairs." Sudan contends that service should have been sent to Sudan's Minister of Foreign Affairs at the Ministry of Foreign Affairs in Khartoum, and because service was ineffective under § 1608(a), the D.C. District Court lacked personal jurisdiction over Sudan.

In answering this issue, one of first impression in our Circuit, we look to the statutory language, cases that have interpreted this statute, and the legislative history. *See United States v. Allen*, 788 F.3d 61, 66 (2d Cir. 2015).

On its face, the statute requires that process be mailed "to the head of the ministry of foreign affairs of the foreign state." 28 U.S.C. § 1608(a)(3). It is silent as to a specific location where the mailing is to be addressed. If Congress had wanted to require that the mailing be sent to the head of the ministry of foreign affairs in the foreign county, it could have said so. In § 1608(a)(4), for example, Congress specified that the papers be mailed "to the Secretary of State *in Washington, District of Columbia*, to the attention of the Director of Special

service as it was mailed and received by the Embassy, and whether that service satisfied the statute.

Consular Services," for transmittal to the foreign state "through diplomatic channels." *Id.* § 1608(a)(4) (emphasis added). Nothing in § 1608(a)(3) requires that the papers be mailed to a location in the foreign state, and the method chosen by plaintiffs -- a mailing addressed to the minister of foreign affairs at the embassy -- was consistent with the language of the statute and could reasonably be expected to result in delivery to the intended person.

What little case law there is on this question accords with our reading of § 1608(a)(3), that service on a minister of foreign affairs via an embassy address constitutes literal compliance with the statute. This is not the first time that Sudan has made the argument for a more restrictive reading of § 1608(a)(3). In *Rux v. Republic of Sudan*, the Eastern District of Virginia rejected Sudan's contention that service had to be mailed directly to the Minister of Foreign Affairs at the Ministry of Foreign Affairs in Khartoum, rather than to the Minister of Foreign Affairs via the Sudanese Embassy. No. 04-CV-428, 2005 WL 2086202, at *16 (E.D. Va. Aug. 26, 2005), *aff'd on other grounds*, 461 F.3d 461 (4th Cir. 2006). The district court found that "[t]he text of § 1608(a)(3) does not prohibit service on the Minister of Foreign Affairs at an embassy address.

Indeed, the statute does not prescribe the place of service, only the person to whom process must be served."  *Id.*

In another case, *Wye Oak Technology, Inc. v. Republic of Iraq*, the Eastern District of Virginia similarly held that service via an embassy is sufficient to satisfy the FSIA as long as the service is directed to the Minister of Foreign Affairs.  No. 09-CV-793, 2010 WL 2613323, at *5-6 (E.D. Va. June 29, 2010), *aff'd on other grounds*, 666 F.3d 2015 (4th Cir. 2011).  In *Wye Oak*, a summons was issued by the clerk of the court to the "Head of the Ministry of Foreign Affairs of Iraq, care of the Embassy of the Republic of Iraq in Washington, DC."  *Id.* at *4 (internal quotation marks omitted).  The district court found that:

> Section (a)(3) does not impose a requirement that an otherwise proper service package must be delivered to a particular destination.  No doubt, the address to which the service package is directed must bear some objectively reasonable relationship to the head of the Ministry of Foreign Affairs and the chosen method of delivery must have some reasonable expectation of success.  However, there is nothing on the face of Section (a)(3) that prohibits [plaintiff]'s chosen method of delivery to the head of the Ministry of Foreign Affairs . . . .

*Id.* at *5.  We agree.

Cases where § 1608(a)(3) service was held to be ineffective involved suits where service was sent "to a *person* other than the Minister of Foreign Affairs, not to a *plac*e other than the Ministry of Foreign Affairs." *Rux*, 2005 WL 2086202, at \*16 (emphasis in original); *see Magness v. Russian Fed'n*, 247 F.3d 609, 613 (5th Cir. 2001) (finding service improper where complaint sent to Texas Secretary of State for forwarding to Boris Yeltsin, and also sent directly to Russian Deputy Minister of Culture); *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153-54 (D.C. Cir. 1994) (finding service improper when made on "the Bolivian Ambassador and Consul General in Washington, and the Bolivian First Minister and the Bolivian Air Force in La Paz[,] but never [on] the Ministry of Foreign Affairs or the Secretary of State"); *Alberti v. Empresa Nicaraguense De La Carne*, 705 F.2d 250, 253 (7th Cir. 1983) (holding that the Ambassador of Nicaragua cannot be construed as the head of the ministry of foreign affairs).

The legislative record on § 1608(a)(3) is sparse, and sheds little light on the question. The 1976 House Judiciary Committee Report seemed to contemplate -- and reject -- service on an embassy in its discussion of proposed methods of service under the FSIA:

> A second means [of service], of questionable validity, involves the mailing of a copy of the summons and

- 15 -

> complaint to a diplomatic mission of the foreign state.
> Section 1608 precludes this method so as to avoid
> questions of inconsistency with section 1 of article 22 of
> the Vienna Convention on Diplomatic Relations, 23 UST
> 3227, TIAS 7502 (1972), which entered into force in the
> United States on December 13, 1972.  Service on an
> embassy by mail would be precluded under this bill.
> *See* 71 Dept. of State Bull. 458-59 (1974).

H.R. Rep. No. 94-1487, at 26 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6625.

This report, though, fails to make the distinction at issue in the instant case,

between "[s]ervice *on* an embassy by mail," *id.* (emphasis added), and service on

a minister of foreign affairs *via* or *care of* an embassy.  The House Report suggests

that § 1608 precludes service on an embassy to prevent any inconsistency with

the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227

(entered into force in United States Dec. 13, 1972) [hereinafter Vienna

Convention].  The relevant sections of the Vienna Convention say only that "[t]he

premises of the mission shall be inviolable," and that "[a] diplomatic agent shall

. . . . enjoy immunity from [the host state's] civil and administrative jurisdiction."

*Id.* arts. 22, 31.  In a case where the suit is not against the embassy or diplomatic

agent, but against the foreign state with service on the foreign minister *via* the

embassy address, we do not see how principles of mission inviolability and

diplomatic immunity are implicated. Moreover, Sudan has not sought to rely on this legislative history.

In this case, service was directed to the right individual, using the Sudanese Embassy address for transmittal. Process was not served on the foreign mission; rather, process was served on the Minister of Foreign Affairs via the foreign mission. The requirement advanced by Sudan, that service be mailed directly to a ministry of foreign affairs in the foreign country, makes little sense from a reliability perspective and as a matter of policy. While direct mailing relies on the capacity of the foreign postal service or a commercial carrier, mail addressed to an embassy -- as an extension of the foreign state -- can be forwarded to the minister by diplomatic pouch. *See Rux*, 2005 WL 2086202, at *16 (addressing the "inherent reliability and security associated with diplomatic pouches," which, "unlike the United States Postal Service, DHL, or any other commercial carrier, is accorded heightened protection under international law to ensure safe and uncompromised delivery of documents between countries." (citing Vienna Convention, art. 27)).

We conclude that plaintiffs complied with the plain language of the FSIA's service of process requirements at 28 U.S.C. § 1608(a)(3).

Finally, though not well developed in its brief, we construe Sudan as also raising a question as to whether service was proper in the turnover proceedings. Because we have found that service of the default judgment in the underlying D.C. District Court case was proper, Sudan's argument fails. *See* 28 U.S.C. § 1608(e) ("A copy of [the] default judgment shall be sent to the foreign state . . . in the manner prescribed for service in this section."); *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1130 (9th Cir. 2010) ("The FSIA is quite clear what a plaintiff must serve on a foreign state before a court may enforce a default judgment against that state: the default judgment. Service of post-judgment motions is not required."); *Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 747-49 (7th Cir. 2007) (holding that the federal rules for service applied because the FSIA's service provisions do not cover post-judgment motions).

Here, plaintiffs served all three turnover petitions at issue, as well as their Motion for Entry of Order Finding Sufficient Time Has Passed to Seek Attachment and Execution of Defendant / Judgment Debtor's Assets, by U.S. mail addressed to Sudan's new Minister of Foreign Affairs, Ali Ahmed Karti, via the Embassy of Sudan in Washington. Service of these post-judgment motions was not governed by the heightened standards of § 1608(a), and was required to

adhere only to the notice provisions of the federal rules, with which plaintiffs complied. *See* Fed. R. Civ. P. 5(a)(2) ("No service is required on a party who is in default for failing to appear. But a pleading that asserts a new claim for relief against such a party must be served on that party under Rule 4."); Fed. R. Civ. P. 5(b)(2)(C) ("A paper is served" by "mailing it to the person's last known address -- in which event service is complete upon mailing.").

**B.** *Attachment of Assets Without an OFAC License or Case-Specific DOJ Statement of Interest*

Sudan contends that the District Court erred in ordering the turnover of sanctions-controlled assets without first procuring either an OFAC license or a case-specific DOJ Statement of Interest stating that no OFAC license was necessary. We disagree. The government has made its position known through previous Statements of Interest that judgment holders under the Terrorism Risk Insurance Act of 2002 (the "TRIA"), 28 U.S.C. § 1610 note, are exempt from the normal OFAC licensure requirement, and the government's position is not limited to the cases in which it filed the Statements.

Section 1605 of the FSIA creates exceptions to the general blanket immunity of foreign states from the jurisdiction of U.S. courts, including the "terrorism exception," 28 U.S.C. § 1605A, which Congress added to the FSIA in

1996 to "give American Citizens an important economic and financial weapon against . . . outlaw states" that sponsor terrorism. H.R. Rep. No. 104-383, at 62 (1995). This exception allows courts to hear claims against foreign states designated by the State Department as "state sponsor[s] of terrorism." *See Calderon-Cardona v. Bank of N.Y. Mellon*, 770 F.3d 993, 996 (2d Cir. 2014).[6]

In an effort to further aid victims of terrorism in satisfying judgments against foreign sponsors of terrorism, Congress enacted the TRIA, the purpose of which is to "deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties." *Weininger v. Castro*, 462 F. Supp. 2d 457, 483 (S.D.N.Y. 2006) (quoting H.R. Rep. No. 107-779, at 27 (2002)). Section 201(a) of the TRIA, which governs post-judgment attachment in some terrorism cases, provides, in relevant part:

> Notwithstanding any other provision of law . . . , in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune

---

[6] The State Department currently designates Iran, Sudan, and Syria as state sponsors of terrorism. Sudan has been designated as such since August 12, 1993. U.S. Dep't of State, *State Sponsors of Terrorism*, http://www.state.gov/j/ct/list/c14151.htm (last visited Sept. 22, 2015).

under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a) (codified at 28 U.S.C. § 1610 note).

Sudanese assets in the United States are subject to just such a block, pursuant to sanctions that began with Executive Order 13067 in 1997 and are now administered by OFAC and codified at 31 C.F.R. Part 538. Ordinarily, unless a plaintiff obtains a license from OFAC, he is barred from attaching assets that are frozen under such sanctions regimes. *See Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, N.Y. Branch*, 919 F. Supp. 2d 411, 422 (S.D.N.Y. 2013).[7] Nonetheless, barring any contrary authority, a court will accept that no OFAC

---

[7]      In the case of Sudan, there are two relevant provisions that forbid the attachment of blocked assets. *See* 31 C.F.R. § 538.201(a) ("Except as authorized by regulations, orders, directives, rulings, instructions, licenses, or otherwise, no property or interests in property of the Government of Sudan, that are in the United States . . . may be transferred . . . ."); 31 C.F.R. § 538.313 ("The term *transfer* means . . . the issuance, docketing, filing, or levy of or under any judgment, decree, attachment, injunction, execution, or other judicial or administrative process or order, or the service of any garnishment . . . ." (emphasis added)).

- 21 -

license is required on the authority of a DOJ Statement of Interest filed pursuant to 28 U.S.C. § 517. *Id.* at 423.

The question, then, is whether § 201(a) of the TRIA and § 1610(g) of the FSIA, which authorize the execution of § 1605A judgments against state sponsors of terrorism, permit a § 1605A judgment holder to attach blocked Sudanese assets without a license from OFAC. The government, in previous Statements of Interest, has answered this question in the affirmative.

In *Weininger*, plaintiffs obtained a default judgment against Cuba and sought turnover of funds blocked pursuant to the Cuban Assets Control Regulations, held by a garnishee bank. 462 F. Supp. 2d at 499. The bank petitioned for interpleader relief. In a Statement of Interest filed with the district court, the DOJ indicated that "[i]n the event the Court determines that the funds are subject to TRIA, the funds may be distributed without a license from the Office of Foreign Assets Control." *Id.* (alteration in original) (quoting DOJ Ltr., Jan. 6, 2006).

Several years later, in the D.C. District Court, the DOJ filed a Statement of Interest that, while primarily addressing a different question, took the position that "when a blocked asset comes within TRIA's scope, TRIA

generally overrides OFAC's regulations requiring that a license be obtained before the asset is attached." *Estate of Heiser v. Islamic Republic of Iran*, No. 00-CV-2329, 807 F. Supp. 2d 9 (D.D.C. 2011) (Docket No. 230).

Finally, in a related case, *Bank of Tokyo*, the government yet again reiterated its position in a Statement of Interest filed with the district court. 919 F. Supp. 2d at 422-23. In *Bank of Tokyo*, petitioners were family members and the estates of seventeen Air Force servicemembers killed in the 1996 Khobar Towers bombing in Saudi Arabia, and sought to satisfy the D.C. District Court judgment against the Islamic Republic of Iran by compelling respondent banks in New York to relinquish sanctions-blocked funds. The district court held that petitioners were entitled to attachment of Iran's assets, relying in part on the letter from the U.S. Attorney's Office. The Statement of Interest explicitly noted that the DOJ had previously addressed this issue in another public filing, in *Weininger*, 462 F. Supp. 2d 457. The district court noted that it "is aware of no contrary authority that would require an OFAC license in this instance. It accepts the Statement of Interest's assertion that no OFAC license is required." *Bank of Tokyo*, 919 F. Supp. 2d at 423.

- 23 -

Sudan contends that unlike in *Bank of Tokyo*, the District Court in the instant case did not seek a Statement of Interest before issuing the turnover order. While it is true that the District Court did not explicitly seek a new case-specific Statement from DOJ, it relied on the persuasive authority of the previous Statements on the issue. In the December 12, 2013, December 13, 2013, and January 6, 2014 turnover orders, the District Court wrote that "[a]n OFAC license is not necessary to disburse these funds and no notice is necessary to the Sudanese agencies and instrumentalities." J. App. at 67, 73, 78 (citing *Bank of Tokyo*, 919 F.Supp. 2d at 422; *Heiser v. Islamic Republic of Iran*, 807 F.Supp. 2d at 23; *Weininger*, 462 F.Supp. 2d 457).

Sudan points to no authority that requires a court to seek a new Statement of Interest in every case in which this issue arises. Unless or until the United States changes its position, the *Weininger* and *Heiser* Statements of Interests represent the government's clear intent to exempt TRIA judgment holders from sanctions regime OFAC licensure requirements. Because we find that the District Court properly relied on the *Weininger* and *Heiser* letters, we need not reach appellees' alternative argument for affirmance, that as a matter of law, even without recourse to a Statement of Interest, an OFAC license is

unnecessary to distribute blocked assets to a TRIA judgment holder. *See, e.g.,* *Rubin v. Islamic Republic of Iran*, 709 F.3d 49, 54 (1st Cir. 2013) ("TRIA thereby allows a person to circumvent the normal process for attaching assets that are blocked under a sanctions program, which entails obtaining a license from OFAC.").

Once a district court determines that blocked assets are subject to the TRIA, those funds may be distributed without a license from OFAC. Plaintiffs in this case obtained an underlying § 1605A terrorism judgment from the D.C. District Court and properly domesticated that judgment in the Southern District of New York, asserting a right to execute against Sudan's assets pursuant to the TRIA and 28 U.S.C. § 1610(g). The turnover orders then properly issued.

## *CONCLUSION*

For the foregoing reasons, the orders of the district court are AFFIRMED.