14-121-cv
*Harrison v. Republic of Sudan*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

August Term 2015

(Argued:    March 11, 2016    Decided:    September 22, 2016)

Docket No. 14-121-cv

---

RICK HARRISON, JOHN BUCKLEY, III, MARGARET LOPEZ, ANDY LOPEZ, KEITH LORENSEN, LISA LORENSEN, EDWARD LOVE, ROBERT MCTUREOUS, DAVID MORALES, GINA MORRIS, MARTIN SONGER, JR., SHELLY SONGER, JEREMY STEWART, KESHA STIDHAM, AARON TONEY, ERIC WILLIAMS, CARL WINGATE, TRACEY SMITH, as personal representative of the Estate of Rubin Smith,

*Plaintiffs-Appellees,*

v.

REPUBLIC OF SUDAN,

*Defendant-Appellant,*

ADVANCED CHEMICAL WORKS, AKA Advanced Commercial and Chemical Works Company Limited, AKA Advanced Training and Chemical Works Company Limited, Accounts & Electronics Equipments, AKA Accounts and Electronics Equipments, et al.,

*Defendants,*

NATIONAL BANK OF EGYPT, CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK,

*Respondents.*

ON PETITION FOR REHEARING

Before:

LYNCH and CHIN, *Circuit Judges*,
and KORMAN, *District Judge*.[*]

The Republic of Sudan petitions for panel rehearing or rehearing *en banc* of this Court's decision holding that service of process on the Minister of Foreign Affairs via the Sudanese Embassy in Washington, D.C., was sufficient to meet the requirements of the Foreign Sovereign Immunities Act (the "FSIA"). The United States, as *amicus curiae*, supports the Republic of Sudan and seeks clarification on the issue of whether § 1610(g) of the FSIA overrides the requirement of a license from the Treasury Department's Office of Foreign Assets Control. The petition is DENIED to the extent it seeks panel rehearing.

---

[*] The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

ANDREW C. HALL (Roarke Maxwell, *on the brief*),
    Hall, Lamb and Hall, P.A., Miami, Florida,
    *for Plaintiffs-Appellees*.

CHRISTOPHER M. CURRAN (Nicole Erb, Claire A.
    DeLelle, *on the brief*), White & Case LLP,
    Washington, D.C., *for Defendant-Appellant*.

DAVID S. JONES, Assistant United States Attorney
    (Benjamin H. Torrance, Assistant United
    States Attorney, *on the brief*), *for* Preet
    Bharara, United States Attorney for the
    Southern District of New York, New York,
    New York, *for the United States of America as*
    Amicus Curiae.

CHIN, *Circuit Judge*:

On September 23, 2015, we affirmed three orders of the United States District Court for the Southern District of New York (Torres, *J.*) directing certain banks to turnover assets of defendant-appellant Republic of Sudan ("Sudan") to satisfy a judgment entered in favor of plaintiffs against Sudan in the United States District Court for the District of Columbia (the "D.C. District Court"), in the amount of $314,705,896. Sudan petitions for panel rehearing or rehearing *en banc*, supported by the United States of America, as *amicus curiae*.

After further briefing and argument, upon due consideration, we adhere to our decision to affirm. The petition is DENIED to the extent it seeks panel rehearing.

*BACKGROUND*

The facts and procedural history are set forth in our September 23, 2015 opinion, familiarity with which is assumed. *See Harrison v. Republic of Sudan*, 802 F.3d 399 (2d Cir. 2015) (the "Panel Opinion"). We summarize the background as follows:

This case arises from the bombing of the U.S.S. Cole in the port of Aden, Yemen, in 2000. Sailors and spouses of sailors injured in the explosion brought suit against Sudan in the D.C. District Court under the FSIA, 28 U.S.C. §§ 1130, 1602 *et seq.*, alleging that al Qaeda was responsible for the attack and that Sudan had provided material support to al Qaeda.

The action was commenced in October 2010, and, at plaintiffs' request, the Clerk of the D.C. District Court served the summons and complaint on Sudan in November 2010 by mailing the papers to the Minister of Foreign Affairs of Sudan via the Sudanese Embassy in Washington, D.C. The papers were sent via registered mail, return receipt requested to:

Republic of Sudan
Deng Alor Koul
Minister of Foreign Affairs
Embassy of the Republic of Sudan
2210 Massachusetts Avenue NW
Washington, DC 2008

As represented by plaintiffs, Deng Alor Koul was the Minister of Foreign Affairs of Sudan at the time.

On November 17, 2010, the Clerk of Court entered a Certificate of Mailing certifying that the summons and complaint were sent via domestic certified mail to the "head of the ministry of foreign affairs," via the Sudanese Embassy in Washington, D.C., and that the return receipt was returned to the Clerk of Court and received on November 23, 2010. No attempt was made to serve Sudan by mail to the address of the Ministry of Foreign Affairs in Khartoum, the capital. Sudan failed to serve an answer or other responsive pleading within sixty days after plaintiffs' service, *see* 28 U.S.C. § 1608(d), and the Clerk of Court thus entered a default against Sudan.

On March 30, 2012, after a hearing, the D.C. District Court (Lamberth, *J.*) entered a default judgment against Sudan in the amount of $314,705,896, *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 51 (D.D.C. 2012), and found, *inter alia*, that service on Sudan had been proper, *id.* at 28. At the

request of plaintiffs, on April 20, 2012, the Clerk of the Court mailed a copy of the default judgment by registered mail, return receipt requested, to Sudan's Minister of Foreign Affairs, via the Sudanese Embassy in Washington, D.C. While it does not appear that the receipt was returned, plaintiffs submitted proof that the mailing was delivered.

The judgment was thereafter registered in the Southern District of New York. In December 2013 and January 2014, the Southern District issued three turnover orders, directing certain banks to turnover assets of Sudan to plaintiffs. It was only after the last of these three turnover orders was entered that Sudan finally filed a notice of appearance, on January 13, 2014. The same day, Sudan appealed the turnover orders to this Court.[1]

In affirming the turnover orders, we held that service of process on the Minister of Foreign Affairs via the Sudanese Embassy in Washington, D.C., was sufficient to meet the requirements of the FSIA. *Harrison*, 802 F.3d at 406. We also held that the District Court did not err in issuing the turnover orders without first obtaining a license from the Treasury Department's Office of

---

[1] Nearly a year and a half later, after this appeal had been argued and while the appeal was pending, Sudan made a Rule 60(b) motion in the D.C. District Court to set aside the default judgment. Motion to Vacate Memorandum & Opinion, *Harrison v. Republic of Sudan*, No. 1:10-cv-01689-RCL (D.D.C. June 14, 2015), ECF No. 55. That court has not yet decided that motion.

Foreign Assets Control ("OFAC") or a Statement of Interest from the Department of Justice. *Id.* at 407.

On October 7, 2015, Sudan filed this petition for panel rehearing or rehearing *en banc*. Although it had not appeared in the earlier proceedings, the United States filed an *amicus* brief in support of the petition on November 6, 2015. After further briefing, we heard argument on March 11, 2016. We now deny the petition to the extent it seeks panel rehearing.

## *DISCUSSION*

Sudan and the United States argue that the Panel Opinion misinterprets § 1608(a)(3) of the FSIA and puts the United States in violation of its obligations under the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227 (entered into force in United States Dec. 13, 1972) [hereinafter "Vienna Convention"]. In its reply brief, Sudan also makes the factual argument that the summons and complaint were not actually delivered to the embassy. Finally, as to the issue of the requirement of an OFAC license, the United States argues that the FSIA does not override the requirement of an OFAC license. We address each of these issues in turn.

**I.** *Interpretation of § 1608(a)(3)*

Sudan and the United States argue that the Panel Opinion incorrectly interprets § 1608(a)(3) of the FSIA. We acknowledge that the statutory interpretation question presents a close call, and that the language of § 1608(a)(3) is not completely clear. Nonetheless, for the reasons discussed below, we believe, as a matter of statutory construction, that the better reading of the statute favors plaintiffs' position. Accordingly, we adhere to our prior decision.

**A.** *The Plain Language*

The "starting point in statutory interpretation is the statute's plain meaning, if it has one." *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000). Section 1608(a)(3) of the FSIA reads: "Service in the courts of the United States and of the States shall be made upon a foreign state or political subdivision of a foreign state . . . by sending a copy of the summons and complaint and a notice of suit . . . to be addressed and dispatched by the clerk of the court to the head of

the ministry of foreign affairs of the foreign state concerned." 28 U.S.C. §
1608(a)(3).[2]

On its face, the statute does not specify a location where the papers
are to be sent; it specifies only that the papers are to be addressed and dispatched
to the head of the ministry of foreign affairs. Nothing in § 1608(a)(3) requires
that the papers be mailed to a location in the foreign state, or indeed to any
particular address, and nothing in the statute precluded the method chosen by
plaintiffs. A mailing addressed to the minister of foreign affairs via Sudan's
embassy in Washington, D.C., was consistent with the language of the statute
and could reasonably be expected to result in delivery to the intended person.[3]

---

[2] As we discuss in the Panel Opinion, the FSIA provides for four methods
of service. *Harrison*, 802 F.3d at 403. The method set forth in § 1608(a)(3) is the method
at issue in this case.

[3] An embassy is a logical place to direct a communication intended to reach
a foreign country. As explained by the United States State Department, "an embassy is
the nerve center for a country's diplomatic affairs within the borders of another nation,
serving as the headquarters of the chief of mission, staff and other agencies."
Diplomacy 101, What Is a U.S. Embassy?, http://diplomacy.state.gov/
discoverdiplomacy/diplomacy101/places/170537.htm; *see also Rux v. Republic of Sudan*,
No. Civ.A. 2:04CV428, 2005 WL 2086202, at *16 (E.D. Va. Aug. 26, 2005), *aff'd on other
grounds*, 461 F.3d 461 (4th Cir. 2006) (underscoring the "inherent reliability and security
associated with diplomatic pouches," which, "unlike the United States Postal Service,
DHL, or any other commercial carrier, is accorded heightened protection under
international law to ensure safe and uncompromised delivery of documents between
countries" (citing Vienna Convention, art. 27)). We do not suggest that service could be
made on a minister of foreign affairs via other offices in the United States or another

Plaintiffs literally complied with the statute -- they sent a copy of the summons and complaint addressed to the head of the ministry of foreign affairs of Sudan.

The statute does not specify that the mailing be sent to the head of the ministry of foreign affairs *in* the foreign country. If Congress had wanted to require that the mailing be sent to the minister of foreign affairs at the principal office of the ministry in the foreign country, it could have said so -- but it did not. *See Burrage v. United States*, 134 S. Ct. 881, 892 (2014) ("The role of this Court is to apply the statute as it is written—even if we think some other approach might 'accor[d] with good policy.'") (quoting *Commissioner v. Lundy*, 516 U.S. 235, 252 (1996)); *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994) (rejecting argument that aiding and abetting liability existed because Congress did not use words "aid" and "abet" in statutory text and noting that "Congress knew how to impose aiding and abetting liability when it chose to do so"). In § 1608(a)(4), for example, Congress specified that the papers be mailed "to the Secretary of State *in Washington, District of Columbia*, to the attention of the Director of Special Consular Services," for transmittal to the

---

country maintained by the country in question, such as, *e.g.*, a consular office, the country's mission to the United Nations, or a tourism office.

- 10 -

foreign state "through diplomatic channels."  28 U.S.C. § 1608(a)(4) (emphasis

added).

The United States argues that the FSIA's service provisions require

strict compliance, and that mailing the papers to "the foreign minister at a place

other than the foreign ministry" is not authorized by the statute.  Amicus Br. of

the United States at 3.  The United States argues that "[t]he most natural

understanding of [the statute's] text is that the mail will be sent to the head of the

ministry of foreign affairs at his or her regular place of work -- *i.e.*, at the ministry

of foreign affairs in the state's seat of government."  *Id.* at 2.  This argument is

unpersuasive, as it would require us to read the words "at his or her regular

place of work" or "at the state's seat of government" into the statute.  *See Dean v.*

*United States*, 556 U.S. 568, 572 (2009) (courts must "ordinarily resist reading

words or elements into a statute that do not appear on its face") (quoting *Bates v.*

*United States*, 522 U.S. 23, 29 (1997)).

The United States argues that our reading of § 1608(a)(3) is

undermined by other provisions in the statute.  It argues that because the FSIA

permits the use of an authorized agent only in the context of service under §

1608(b)(2) -- the provision that deals with service on foreign state agencies and

- 11 -

instrumentalities -- we should infer that "Congress did not intend to allow service on a foreign state via delivery to any entity that could, by analogy, be considered the foreign state's officer or agent, including the state's embassy." Amicus Br. of the United States at 3. This argument rests on the premise that the Panel Opinion requires an embassy to act as an agent of a foreign state. We did not so hold, and, to the extent there is any doubt, we now clarify.

We do not hold that an embassy is an agent for service or a proxy for service for a foreign state. There is a significant difference between *serving process* on an embassy, and mailing papers to a country's foreign ministry *via* the embassy. Here, the summons and complaint were addressed to the Sudanese Minister of Foreign Affairs, by name and title, at the Sudanese Embassy. The embassy accepted the papers, signing for them and sending back a return receipt to the Clerk of Court.[4] The embassy could have rejected the mailing, but instead it accepted the papers and then explicitly acknowledged receipt. Accordingly, the papers were not served on the embassy as a proxy or agent for Sudan, but they were instead mailed to the Minister of Foreign Affairs, in the most natural way possible -- addressed to him, by name, via Sudan's embassy.

---

[4] In its reply brief on its petition for rehearing, Sudan argues for the first time in this nearly six-year old litigation that in fact the embassy did not receive the papers. We discuss this issue below.

In short, while the language of the statute is not wholly unambiguous, we believe that the better reading is that it did not require service on the foreign minister at his or her regular place of work or in the state's seat of government. Hence, service on the foreign minister via the embassy was not inconsistent with the wording of the statute.

## B.    *Legislative History*

We turn to the legislative history to see whether it sheds light on the statutory interpretation question

As we noted in the Panel Opinion, while the 1976 House Judiciary Committee Report makes clear that the statute does not permit service by "the mailing of a copy of the summons and complaint to a diplomatic mission of the foreign state," see H.R. Rep. No. 94–1487, at 26 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6625, it does not address the question of mailing the papers to the minister of foreign affairs via or care of an embassy. The Report provides,

> Special note should be made of two means which are currently in use in attempting to commence litigation against a foreign state. . . .  A second means, of questionable validity, involves the mailing of a copy of the summons and complaint to a diplomatic mission of the foreign state.  Section 1608 precludes this method so as to avoid questions of inconsistency with section 1 of article 22 of the Vienna Convention on Diplomatic

Relations, 23 UST 3227, TIAS 7502 (1972), which entered into force in the United States on December 13, 1972. Service on an embassy by mail would be precluded under this bill. See 71 Dept. of State Bull. 458-59 (1974).

H.R. Rep. 94–1487, at 26.

As we noted in the Panel Opinion, the report fails to make the distinction at issue in the instant case, between "[s]ervice *on* an embassy by mail," *id.* (emphasis added), and service on a minister or foreign affairs *via* or *care of* an embassy. The legislative history does not address, any more than does the statutory text, whether Congress intended to permit the mailing of service to a foreign minister via an embassy. What it does make clear, however, is that Congress was concerned about the interaction of this provision and Article 22 of the Vienna Convention. Accordingly, we must consider the Vienna Convention, which we discuss below.

### C. *Judicial Interpretation*

Before turning to the Vienna Convention, we consider the case law on the statutory interpretation issue.

As we noted in the Panel Opinion, we are not alone in our reading of § 1608(a)(3). In *Wye Oak Technology, Inc. v. Republic of Iraq*, the Eastern District of Virginia held that "Section (a)(3) does not impose a requirement that an

otherwise proper service package must be delivered to a particular destination." No. 1:09cv793, 2010 WL 2613323, at *5 (E.D. Va. June 29, 2010), *aff'd on other grounds*, 666 F.3d 205 (4th Cir. 2011). There, the court held that service via an embassy is sufficient to satisfy the FSIA as long as the service is directed to the Minister of Foreign Affairs. *Id.* at *5-6. The Eastern District of Virginia also so held in *Rux v. Republic of Sudan*. 2005 WL 2086202, at *16 ("The text of § 1608(a)(3) does not prohibit service on the Minister of Foreign Affairs at an embassy address. Indeed, the statute does not prescribe the place of service, only the person to whom process must be served."). It is true, as Sudan argues, that these were district court opinions, but Sudan has not cited any case, district court or otherwise, holding that the mailing of papers addressed to the minister of foreign affairs via an embassy does *not* comply with the statute.

None of the cases relied on by Sudan or the United States undermines our reading of § 1608(a)(3). In four of the cases, the plaintiffs served the papers on the embassy or the ambassador, without addressing them to the minister of foreign affairs. *See Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 28-29 (D.C. Cir. 2015) (service package addressed to embassy); *Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 741 (7th Cir. 2007) (no record of

- 15 -

service but counsel submitted affidavit stating document had been served "on the embassy in Washington, D.C."); *Alberti v. Empresa Nicaraguense De La Carne*, 705 F.2d 250, 253 (7th Cir. 1983) (service package addressed to ambassador); *Ellenbogen v. The Canadian Embassy*, No. Civ.A. 05-01553JDB, 2005 WL 3211428, at *2 (D.D.C. Nov. 9, 2005) (service package addressed to embassy).  Consequently, those plaintiffs did not comply with the statute.

In another case, we interpreted a different provision of the FSIA, § 1608(b)(2), and held that persons entitled to diplomatic immunity are not proper agents for service under the FSIA.  *Tachiona v. United States*, 386 F.3d 205, 222 (2d Cir. 2004) (holding that § 1608(b)(2) does not authorize service on foreign officials present in United States as agents for a private political party).  *Tachiona* did not address the issue before us.  In two other cases, the opinions do not say to whom the papers were addressed.  *See Lucchino v. Foreign Countries of Brazil, S. Korea, Spain, Mexico, & Argentina*, 631 F. Supp. 821, 826 (E.D. Pa. 1986); *40 D 6262 Realty Corp. v. United Arab Emirates Gov't*, 447 F. Supp. 711 (S.D.N.Y. 1978).

Section 1608(a)(3) explicitly provides that service on a foreign sovereign must be "*addressed* and dispatched by the clerk of the court *to* the head of the ministry of foreign affairs of the foreign state concerned."  28 U.S.C.

§ 1608(a)(3) (emphasis added). Cases involving mailings not so addressed are not controlling. We adhere to our conclusion that the plain language of § 1608(a)(3) does not foreclose the plaintiffs' method of service.

## II. *The Vienna Convention*

Sudan and the United States contend that the Panel Opinion places the United States in violation of the Vienna Convention. They contend that the Panel Opinion will complicate international relations by subjecting the United States (and other countries) to service of process via any of its diplomatic missions throughout the world, despite its long-standing policy to refuse such service. As a preliminary matter, we note that these arguments were not properly raised in Sudan's initial briefs. Nonetheless, we exercise our discretion to consider the arguments, and we reject them.

The FSIA is the sole basis for obtaining jurisdiction over a foreign state in the courts of the United States. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). As noted above, the "legislative history of the FSIA demonstrates unequivocally that the Act was not intended to affect the immunity of 'diplomatic or consular representatives,'" that was established under the Vienna Convention and customary international law. *Tachiona*, 386

- 17 -

F.3d at 222-23 (quoting H.R. Rep. 94–1487, at 21). "Under the terms of [the Vienna Convention], the United States, in its role as a receiving state of foreign missions, is obligated to protect and respect the premises of any foreign mission located within its sovereign territory." *Bennett v. Islamic Republic of Iran*, 604 F. Supp. 2d 152, 159 (D.D.C. 2009), *aff'd*, 618 F.3d 19 (D.C. Cir. 2010).

The Panel Opinion does not conflict with the Vienna Convention. The Vienna Convention provides that "[t]he premises of the mission shall be inviolable," and that "[a] diplomatic agent shall . . . enjoy immunity from [the host state's] civil and administrative jurisdiction." Vienna Convention, arts. 22, 31; *see also* H.R. Rep. 94–1487, at 26 ("Service on an embassy by mail would be precluded under this bill."). We acknowledge that these provisions preclude service of process on an embassy or diplomat as an agent of a foreign government, as there would be a breach of diplomatic immunity if an envoy were subjected to compulsory process. *See Tachiona*, 386 F.3d at 222 (noting that "the inviolability principle precludes service of process on a diplomat as agent of a foreign government"); *40 D 6262 Realty Corp.*, 447 F. Supp. at 712 (holding that the FSIA's legislative history makes clear that service by mail on an embassy is precluded under the Act). Accordingly, service on an embassy or consular

official would be improper.  But that is not what happened here.  Rather, process

was served on the Minister of Foreign Affairs at the foreign mission and not on

the foreign mission itself or the ambassador.  The papers were specifically

addressed to the Minister of Foreign Affairs via the embassy, and the embassy

sent back a return receipt acknowledging receipt of the papers.

The United States explains that it "consistently rejects attempted

service via direct delivery to a U.S. embassy abroad.  When a foreign court or

litigant purports to serve the United States through an embassy, the embassy

sends a diplomatic note to the foreign government indicating that the United

States does not consider itself to have been served properly."  Amicus Br. of the

United States at 6.  Our holding does not affect this policy.  We do not preclude

the United States (or any other country) from enforcing a policy of refusing to

accept service via its embassies.  We have previously recognized that "[w]ere the

United States to adopt exceptions to the inviolability of foreign missions here, it

would be stripped of its most powerful defense, that is, that international law

precludes the nonconsensual entry of its missions abroad."  *767 Third Ave. Assocs.*

*v. Permanent Mission of Republic of Zaire to United Nations*, 988 F.2d 295, 300-01 (2d

Cir. 1993).  The United States may continue to instruct its embassies to follow this

protocol, and so may any other country with a foreign diplomatic embassy. Nothing about our decision affects the ability of any state to refuse to accept service via its embassies.

Here, Sudan did not elect to follow any such policy. It did not reject the service papers, as it could have done easily, but accepted them. In these circumstances, where plaintiffs mailed the documents addressed to the Sudanese Minister of Foreign Affairs via the embassy, and the embassy explicitly acknowledged receipt of the documents, the requirements of the statute were met.

Significantly, the Vienna Convention provides that a mission may "consent" to entry onto its premises. Section 1 of Article 22 of the Convention provides that: "The premises of the mission shall be inviolable. The agents of the receiving State may not enter them, except with the *consent* of the head of the mission." Vienna Convention, art. 22 (emphasis added). Here, the Sudanese Embassy's acceptance of the service package surely constituted "consent." Instead of rejecting the service papers, Sudan accepted them and then, instead of returning them, it explicitly acknowledged receiving them. These actions, we conclude, constitute consent.

The Vienna Convention "recognized the independence and sovereignty of mission premises that existed under customary international law." *767 Third Ave. Assocs.*, 988 F.2d at 300. An important reason for the inviolability of the embassy premises is that the embassy is, to some degree, an extension of the sovereignty of the sending state. *See United States v. Gatlin*, 216 F.3d 207, 214 n.9 (2d Cir. 2000). To send officers into the embassy to serve papers would thus be akin to sending officers into the sovereign territory of the sending state itself. There is nothing offensive, however, about mailing a letter into the sovereign territory of a foreign state. Indeed, that is the very procedure that Sudan and the State Department urge is the preferred and required practice. We therefore find it difficult to understand how mailing a letter to the Foreign Minister of a country in care of that country's embassy in Washington -- particularly given that the embassy remains free to refuse delivery if it so chooses -- can be considered a grave insult to the "independence and sovereignty" of the embassy's premises.

Indeed, the embassy is extended somewhat *less* sovereignty than the actual territory of the sending state. *See McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 588 (9th Cir. 1983) ("A United States embassy, however, remains the territory of the receiving state, and does not constitute territory of the United States."); *see*

- 21 -

*also* Jordan J. Paust, *Non-Extraterritoriality of 'Special Territorial Jurisdiction' of the United States: Forgotten History and the Errors of Erdos*, 24 YALE J. INT'L L. 305, 312 (1999) ("[A] U.S. embassy in foreign state territory is not U.S. territory and is not within the territorial jurisdiction of the United States, any more than a foreign embassy within the United States is foreign territory or within the territorial jurisdiction of a foreign state."). While the precise degree to which the sovereignty of the embassy is less than a state's control over its own territory is subject to debate, it is evident that an embassy is not *more* sovereign than the territory of the sending state itself.

It is with some reluctance that we diverge from the Executive Branch's interpretation of the Vienna Convention, and of the potential effect of the Convention on the interpretation of the FSIA. It is appropriate to give the government's interpretation of the Vienna Convention "great weight" -- and we do -- but the State Department's views are "not conclusive." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982). For the reasons stated above, we do not find those views persuasive.

III.    *The Factual Argument*

In its reply in support of its petition for rehearing, Sudan argues that the evidence does not support a finding that the mailing was accepted by Sudan or delivered to the Sudanese Minister of Foreign Affairs.  It argues that the signatures on the return receipt are illegible and it makes a factual argument that the package never reached the embassy.

Sudan's factual challenge to the service of process comes too late, for three independent reasons.  First, Sudan raises the factual arguments for the first time on appeal.  "[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008) (quoting *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006)).

Second, the factual challenge to service requires factfinding. "[F]actfinding is the basic responsibility of district courts, rather than appellate courts, and . . . the Court of Appeals should not . . . resolve[] in the first instance [a] factual dispute which ha[s] not been considered by the District Court." *DeMarco v. United States*, 415 U.S. 449, 450 n.* (1974).  The factual challenge

- 23 -

should have been raised during the five years that the case was pending in the district courts.

Third, even on appeal, Sudan did not raise the factual challenge until its reply brief in support of its petition for rehearing. It did not raise the issue in its briefing of the main appeal or in its initial submission on this petition for rehearing. *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief.").

Accordingly, the factual challenge is not properly before us.

## IV. *The Requirement of an OFAC License*

The United States also seeks to clarify the Panel Opinion with respect to when a license from OFAC is required. In the Panel Opinion, we held that the District Court did not err in issuing turnover orders without first obtaining either an OFAC license or a Statement of Interest from the Department of Justice. *See Harrison*, 802 F.3d at 406-07. This holding was based on the United States' position in previous Statements of Interest that § 201(a) of the Terrorism Risk Insurance Act ("TRIA"), Pub. L. No. 107–297, 116 Stat. 2322, 2337 (codified at 28 U.S.C. § 1610 note), permits a 28 U.S.C. § 1605A judgment holder to attach assets that have been blocked pursuant to certain economic sanctions laws

without obtaining an OFAC license.  The Panel Opinion included language, however, that may have suggested that § 1610(g) of the FSIA might permit a person holding a judgment under § 1605A to attach blocked assets without an OFAC license.  *Harrison*, 802 F.3d at 407-08.  This is not the case and thus we now clarify our ruling.

Section 1605 of the FSIA creates exceptions to the general blanket immunity of foreign states from the jurisdiction of U.S. courts, including the "terrorism exception," 28 U.S.C. § 1605A, which Congress added to the FSIA in 1996 to "give American Citizens an important economic and financial weapon against . . . outlaw states" that sponsor terrorism.  H.R. Rep. No. 104–383, at 62 (1995).  This exception allows courts to hear claims against foreign states designated by the State Department as "state sponsor[s] of terrorism."  *See Calderon–Cardona v. Bank of N.Y. Mellon*, 770 F.3d 993, 996 (2d Cir. 2014).

The TRIA was enacted to aid victims of terrorism in satisfying judgments against foreign sponsors of terrorism.  Section 201(a) of the TRIA, which governs post-judgment attachment in some terrorism cases, provides, in relevant part:

> *Notwithstanding any other provision of law . . .* , in every
> case in which a person has obtained a judgment against

a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a) (codified at 28 U.S.C. § 1610 note) (emphasis added).

Sudanese assets in the United States are subject to such a block, pursuant to sanctions that began with Executive Order 13067 in 1997 and are now administered by OFAC and codified at 31 C.F.R. Part 538. Ordinarily, unless a plaintiff obtains a license from OFAC, he is barred from attaching assets that are frozen under such sanctions regimes. The Panel Opinion held that, based on previous statements of interest made by the United States, blocked assets that are subject to the TRIA may be distributed without a license from OFAC. *Harrison*, 802 F.3d 408-09.

The Panel Opinion framed the issue, however, as "whether § 201(a) of the TRIA and *§ 1610(g) of the FSIA*, which authorize the execution of § 1605A

- 26 -

judgments against state sponsors of terrorism, permit a § 1605A judgment holder to attach blocked Sudanese assets without a license from OFAC. *Id.* at 407-08.

The Panel Opinion should not have included the reference to § 1610(g) of the FSIA. Section 1610(g)(2) of the FSIA, while providing that certain property "shall not be immune from attachment," does not contain the TRIA's same broad "notwithstanding any other provision of law" language. Therefore, it does not override other applicable requirements, such as the requirement of an OFAC license before the funds may be transferred. To be clear, when the TRIA does not apply and the funds at issue are attachable by operation of the FSIA alone, an OFAC license is still required.

In this case, plaintiffs obtained a terrorism judgment from the D.C. District Court pursuant to § 1605A of the FSIA. The Southern District of New York then issued three turnover orders. The first two orders specified that they were issued pursuant to 28 U.S.C. § 1610(g) but did not mention the TRIA. Only the third order specified that assets were "subject to turnover pursuant to § 201 of the Terrorism Risk Insurance Act of 2002." Joint App. at 76. While the district court did not explicitly discuss whether the funds at issue in the December 12 and 13, 2013 orders were subject to turnover pursuant to the TRIA, based on our

review of the record, which includes the complaint and judgment in the D.C. District Court proceedings, and the turnover petition and orders in the proceedings below, we conclude that the funds were subject to turnover pursuant to the TRIA. Plaintiffs have "obtained a judgment against a terrorist party on a claim based upon an act of terrorism," the blocked assets are the assets of that terrorist party, and, accordingly, those assets "shall be subject to execution or attachment in aid of execution in order to satisfy [plaintiffs'] judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable." *See* TRIA § 201(a) (codified at 28 U.S.C. § 1610 note). Because the funds at issue in all three turnover orders were subject to turnover pursuant to the TRIA, plaintiffs were not required to obtain an OFAC license before seeking distribution.

## *CONCLUSION*

For the foregoing reasons, the petition, to the extent it seeks panel rehearing, is DENIED.