(Slip Opinion) OCTOBER TERM, 2018 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## REPUBLIC OF SUDAN *v.* HARRISON ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 16–1094. Argued November 7, 2018—Decided March 26, 2019

The Foreign Sovereign Immunities Act of 1976 (FSIA) generally immunizes foreign states from suit in this country unless one of several enumerated exceptions to immunity applies. 28 U. S. C. §§1604, 1605–1607. If an exception applies, the FSIA provides subject-matter jurisdiction in federal district court, §1330(a), and personal jurisdiction "where service has been made under section 1608," §1330(b). Section 1608(a) provides four methods of serving civil process, including, as relevant here, service "by any form of mail requiring a signed receipt, to be addressed and dispatched . . . to the head of the ministry of foreign affairs of the foreign state concerned," §1608(a)(3).

Respondents, victims of the bombing of the USS *Cole* and their family members, sued the Republic of Sudan under the FSIA, alleging that Sudan provided material support to al Qaeda for the bombing. The court clerk, at respondents' request, addressed the service packet to Sudan's Minister of Foreign Affairs at the Sudanese Embassy in the United States and later certified that a signed receipt had been returned. After Sudan failed to appear in the litigation, the District Court entered a default judgment for respondents and subsequently issued three orders requiring banks to turn over Sudanese assets to pay the judgment. Sudan challenged those orders, arguing that the judgment was invalid for lack of personal jurisdiction, because §1608(a)(3) required that the service packet be sent to its foreign minister at his principal office in Sudan, not to the Sudanese Embassy in the United States. The Second Circuit affirmed, reasoning that the statute was silent on where the mailing must be sent and that the method chosen was consistent with the statute's language and could be reasonably expected to result in delivery to the foreign minister.

Syllabus

*Held*: Most naturally read, §1608(a)(3) requires a mailing to be sent directly to the foreign minister's office in the foreign state. Pp. 5–17.

(a) A letter or package is "addressed" to an intended recipient when his or her name and address are placed on the outside. The noun "address" means "a residence or place of business." Webster's Third New International Dictionary 25. A foreign nation's embassy in the United States is neither the residence nor the usual place of business of that nation's foreign minister. Similarly, to "dispatch" a letter to an addressee connotes sending it directly. It is also significant that service under §1608(a)(3) requires a signed returned receipt to ensure delivery to the addressee. Pp. 5–9.

(b) Several related provisions in §1608 support this reading. Section 1608(b)(3)(B) contains similar "addressed and dispatched" language, but also says that service by its method is permissible "if reasonably calculated to give actual notice." Respondents' suggestion that §1608(a)(3) embodies a similar standard runs up against well-settled principles of statutory interpretation. See *Department of Homeland Security* v. *MacLean*, 574 U. S. \_\_\_, \_\_\_, and *Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U. S. 825, 837. Section 1608(b)(2) expressly allows service on an agent, specifies the particular individuals who are permitted to be served as agents of the recipient, and makes clear that service on the agent may occur in the United States. Congress could have included similar terms in §1608(a)(3) had it intended the provision to operate in this manner. Section 1608(c) deems service to have occurred under all methods only when there is a strong basis for concluding that the service packet will very shortly thereafter come into the hands of a foreign official who will know what needs to be done. Under §1608(a)(3), that occurs when the person who receives it from the carrier signs for it. Interpreting §1608(a)(3) to require that a service packet be sent to a foreign minister's own office rather than to a mailroom employee in a foreign embassy better harmonizes the rules for determining when service occurs. Pp. 9–13.

(c) This reading of §1608(a)(3) avoids potential tension with the Federal Rules of Civil Procedure and the Vienna Convention on Diplomatic Relations. If mailing a service packet to a foreign state's embassy in the United States were sufficient, then it would appear to be easier to serve the foreign state than to serve a person in that foreign state under Rule 4. The natural reading of §1608(a)(3) also avoids the potential international implications arising from the State Department's position that the Convention's principle of inviolability precludes serving a foreign state by mailing process to the foreign state's embassy in the United States. Pp. 13–15.

(d) Respondents' remaining arguments are unavailing. First, their

Syllabus

suggestion that §1608(a)(3) demands that service be sent "to a location that is likely to have a direct line of communication to the foreign minister" creates difficult line-drawing problems that counsel in favor of maintaining a clear, administrable rule. Second, their claim that §1608(a)(4)—which requires that process be sent to the Secretary of State in "Washington, District of Columbia"—shows that Congress did not intend §1608(a)(3) to have a similar locational requirement is outweighed by the countervailing arguments already noted. Finally, they contend that it would be unfair to throw out their judgment based on petitioner's highly technical and belatedly raised argument. But in cases with sensitive diplomatic implications, the rule of law demands adherence to strict rules, even when the equities seem to point in the opposite direction. Pp. 15–17.

802 F. 3d 399, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, BREYER, SOTOMAYOR, KAGAN, GORSUCH, and KAVANAUGH, JJ., joined. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 16–1094

REPUBLIC OF SUDAN, PETITIONER *v.*
RICK HARRISON, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[March 26, 2019]

JUSTICE ALITO delivered the opinion of the Court.

This case concerns the requirements applicable to a particular method of serving civil process on a foreign state. Under the Foreign Sovereign Immunities Act of 1976 (FSIA), a foreign state may be served by means of a mailing that is "addressed and dispatched . . . to the head of the ministry of foreign affairs of the foreign state concerned." 28 U. S. C. §1608(a)(3). The question now before us is whether this provision is satisfied when a service packet that names the foreign minister is mailed to the foreign state's embassy in the United States. We hold that it is not. Most naturally read, §1608(a)(3) requires that a mailing be sent directly to the foreign minister's office in the minister's home country.

## I

### A

Under the FSIA, a foreign state is immune from the jurisdiction of courts in this country unless one of several enumerated exceptions to immunity applies. 28 U. S. C. §§1604, 1605–1607. If a suit falls within one of these exceptions, the FSIA provides subject-matter jurisdiction

in federal district courts. §1330(a). The FSIA also provides for personal jurisdiction "where service has been made under section 1608." §1330(b).

Section 1608(a) governs service of process on "a foreign state or political subdivision of a foreign state." §1608(a); Fed. Rule Civ. Proc. 4(j)(1). In particular, it sets out in hierarchical order the following four methods by which "[s]ervice . . . shall be made." 28 U. S. C. §1608(a). The first method is by delivery of a copy of the summons and complaint "in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision." §1608(a)(1). "[I]f no special arrangement exists," service may be made by the second method, namely, delivery of a copy of the summons and complaint "in accordance with an applicable international convention on service of judicial documents." §1608(a)(2). If service is not possible under either of the first two methods, the third method, which is the one at issue in this case, may be used. This method calls for

> "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, *by any form of mail requiring a signed receipt, to be addressed and dispatched* by the clerk of the court *to the head of the ministry of foreign affairs of the foreign state concerned.*" §1608(a)(3) (emphasis added).

Finally, if service cannot be made within 30 days under §1608(a)(3), service may be effected by sending the service packet "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia," for transmittal "through diplomatic channels to the foreign state." §1608(a)(4).

Once served, a foreign state or political subdivision has 60 days to file a responsive pleading. §1608(d). If the

foreign state or political subdivision does not do this, it runs the risk of incurring a default judgment. See §1608(e). A copy of any such default judgment must be "sent to the foreign state or political subdivision in the [same] manner prescribed for service." *Ibid.*

B

On October 12, 2000, the USS *Cole*, a United States Navy guided-missile destroyer, entered the harbor of Aden, Yemen, for what was intended to be a brief refueling stop. While refueling was underway, a small boat drew along the side of the *Cole*, and the occupants of the boat detonated explosives that tore a hole in the side of the *Cole*. Seventeen crewmembers were killed, and dozens more were injured. Al Qaeda later claimed responsibility for the attack.

Respondents in this case are victims of the USS *Cole* bombing and their family members. In 2010, respondents sued petitioner, the Republic of Sudan, alleging that Sudan had provided material support to al Qaeda for the bombing. See 28 U. S. C. §§1605A(a)(1), (c). Because respondents brought suit under the FSIA, they were required to serve Sudan with process under §1608(a). It is undisputed that service could not be made under §1608(a)(1) or §1608(a)(2), and respondents therefore turned to §1608(a)(3). At respondents' request, the clerk of the court sent the service packet, return receipt requested, to: "Republic of Sudan, Deng Alor Koul, Minister of Foreign Affairs, Embassy of the Republic of Sudan, 2210 Massachusetts Avenue NW, Washington, DC 20008." App. 172. The clerk certified that the service packet had been sent and, a few days later, certified that a signed receipt had been returned.[1] After Sudan failed to appear

—————

[1] Sudan questions whether respondents named the correct foreign minister and whether the Sudanese Embassy received the service packet. Because we find the service deficient in any event, we assume

in the litigation, the District Court for the District of Columbia held an evidentiary hearing and entered a $314 million default judgment against Sudan. Again at respondents' request, the clerk of the court mailed a copy of the default judgment in the same manner that the clerk had previously used. See §1608(e).

With their default judgment in hand, respondents turned to the District Court for the Southern District of New York, where they sought to register the judgment and satisfy it through orders requiring several banks to turn over Sudanese assets. See 28 U. S. C. §1963 (providing for registration of judgments for enforcement in other districts). Pursuant to §1610(c), the District Court entered an order confirming that a sufficient period of time had elapsed following the entry and notice of the default judgment, and the court then issued three turnover orders.

At this point, Sudan made an appearance for the purpose of contesting jurisdiction. It filed a notice of appeal from each of the three turnover orders and contended on appeal that the default judgment was invalid for lack of personal jurisdiction. In particular, Sudan maintained that §1608(a)(3) required that the service packet be sent to its foreign minister at his principal office in Khartoum, the capital of Sudan, and not to the Sudanese Embassy in the United States.

The Court of Appeals for the Second Circuit rejected this argument and affirmed the orders of the District Court. 802 F. 3d 399 (2015). The Second Circuit reasoned that, although §1608(a)(3) requires that a service packet be mailed "to the head of the ministry of foreign affairs of the foreign state concerned," the statute "is silent as to a specific location where the mailing is to be addressed." *Id.,* at 404. In light of this, the court concluded that "the

--------

for the sake of argument that the correct name was used and that the Embassy did receive the packet.

method chosen by plaintiffs—a mailing addressed to the minister of foreign affairs at the embassy—was consistent with the language of the statute and could reasonably be expected to result in delivery to the intended person." *Ibid.*

Sudan filed a petition for rehearing, and the United States filed an *amicus curiae* brief in support of Sudan's petition. The panel ordered supplemental briefing and heard additional oral argument, but it once again affirmed, reiterating its view that §1608(a)(3) "does not specify that the mailing be sent to the head of the ministry of foreign affairs *in* the foreign country." 838 F. 3d 86, 91 (CA2 2016). The court thereafter denied Sudan's petition for rehearing en banc.

Subsequent to the Second Circuit's decision, the Court of Appeals for the Fourth Circuit held in a similar case that §1608(a)(3) "does not authorize delivery of service to a foreign state's embassy even if it correctly identifies the intended recipient as the head of the ministry of foreign affairs." *Kumar* v. *Republic of Sudan*, 880 F. 3d 144, 158 (2018), cert. pending, No. 17–1269.

We granted certiorari to resolve this conflict. 585 U. S. \_\_\_ (2018)

## II
### A

The question before us concerns the meaning of §1608(a)(3), and in interpreting that provision, "[w]e begin 'where all such inquiries must begin: with the language of the statute itself.'" *Caraco Pharmaceutical Laboratories, Ltd.* v. *Novo Nordisk A/S*, 566 U. S. 399, 412 (2012) (quoting *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 241 (1989)). As noted, §1608(a)(3) requires that service be sent "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the

foreign state concerned."

The most natural reading of this language is that service must be mailed directly to the foreign minister's office in the foreign state. Although this is not, we grant, the only plausible reading of the statutory text, it is the most natural one. See, *e.g., United States* v. *Hohri*, 482 U. S. 64, 69–71 (1987) (choosing the "more natural" reading of a statute); *ICC* v. *Texas*, 479 U. S. 450, 456–457 (1987) (same); see also *Florida Dept. of Revenue* v. *Piccadilly Cafeterias, Inc.*, 554 U. S. 33, 41 (2008) (similar).

A key term in §1608(a)(3) is the past participle "addressed." A letter or package is "addressed" to an intended recipient when his or her name and "address" is placed on the outside of the item to be sent. And the noun "address," in the sense relevant here, means "the designation of a place (as a residence or place of business) where a person or organization may be found or communicated with." Webster's Third New International Dictionary 25 (1971) (Webster's Third); see also Webster's Second New International Dictionary 30 (1957) ("the name or description of a place of residence, business, etc., where a person may be found or communicated with"); Random House Dictionary of the English Language 17 (1966) ("the place or the name of the place where a person, organization, or the like is located or may be reached"); American Heritage Dictionary 15 (1969) ("[t]he location at which a particular organization or person may be found or reached"); Oxford English Dictionary 106 (1933) (OED) ("the name of the place to which any one's letters are directed"). Since a foreign nation's embassy in the United States is neither the residence nor the usual place of business of that nation's foreign minister and is not a place where the minister can customarily be found, the most common understanding of the minister's "address" is inconsistent with the interpretation of §1608(a)(3) adopted by the court below and advanced by respondents.

We acknowledge that there are circumstances in which a mailing may be "addressed" to the intended recipient at a place other than the individual's residence or usual place of business. For example, if the person sending the mailing does not know the intended recipient's current home or business address, the sender might use the intended recipient's last known address in the hope that the mailing will be forwarded. Or a sender might send a mailing to a third party who is thought to be in a position to ensure that the mailing is ultimately received by the intended recipient. But in the great majority of cases, addressing a mailing to X means placing on the outside of the mailing both X's name and the address of X's residence or customary place of work.

Section 1608(a)(3)'s use of the term "dispatched" points in the same direction. To "dispatch" a communication means "to send [it] off or away (as to a special destination) with promptness or speed often as a matter of official business." Webster's Third 653; see also OED 478 ("To send off post-haste or with expedition or promptitude (a messenger, message, etc., having an express destination)"). A person who wishes to "dispatch" a letter to X will generally send it directly to X at a place where X is customarily found. The sender will not "dispatch" the letter in a roundabout way, such as by directing it to a third party who, it is hoped, will then send it on to the intended recipient.

A few examples illustrate this point. Suppose that a person is instructed to "address" a letter to the Attorney General of the United States and "dispatch" the letter (*i.e.*, to "send [it] off post-haste") to the Attorney General. The person giving these instructions would likely be disappointed and probably annoyed to learn that the letter had been sent to, let us say, the office of the United States Attorney for the District of Idaho. And this would be so even though a U. S. Attorney's office is part of the De-

partment headed by the Attorney General and even though such an office would very probably forward the letter to the Attorney General's office in Washington. Similarly, a person who instructs a subordinate to dispatch a letter to the CEO of a big corporation that owns retail outlets throughout the country would probably be irritated to learn that the letter had been mailed to one of those stores instead of corporate headquarters. To "dispatch" a letter to an addressee connotes sending it directly.

A similar understanding underlies the venerable "mailbox rule." As first-year law students learn in their course on contracts, there is a presumption that a mailed acceptance of an offer is deemed operative when "dispatched" if it is "properly addressed." Restatement (Second) of Contracts § 66, p. 161 (1979) (Restatement); *Rosenthal* v. *Walker*, 111 U. S. 185, 193 (1884). But no acceptance would be deemed properly addressed and dispatched if it lacked, and thus was not sent to, the offeror's address (or an address that the offeror held out as the place for receipt of an acceptance). See Restatement § 66, Comment *b*.

It is also significant that service under §1608(a)(3) requires a signed returned receipt, a standard method for ensuring delivery to the addressee. Cf. Black's Law Dictionary 1096 (10th ed. 2014) (defining "certified mail" as "[m]ail for which the sender requests proof of delivery in the form of a receipt signed by the addressee"). We assume that certified mail sent to a foreign minister will generally be signed for by a subordinate, but the person who signs for the minister's certified mail in the foreign ministry itself presumably has authority to receive mail on the minister's behalf and has been instructed on how that mail is to be handled. The same is much less likely to be true for an employee in the mailroom of an embassy.

For all these reasons, we think that the most natural reading of §1608(a)(3) is that the service packet must bear

the foreign minister's name and customary address and that it be sent to the minister in a direct and expeditious way. And the minister's customary office is the place where he or she generally works, not a farflung outpost that the minister may at most occasionally visit.

## B

Several related provisions in §1608 support this reading. See *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme").

### 1

One such provision is §1608(b)(3)(B). Section 1608(b) governs service on "an agency or instrumentality of a foreign state." And like §1608(a)(3), §1608(b)(3)(B) requires delivery of a service packet to the intended recipient "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court." But §1608(b)(3)(B), unlike §1608(a)(3), contains prefatory language saying that service by this method is permissible "if reasonably calculated to give actual notice."

Respondents read §1608(a)(3) as embodying a similar requirement. See Brief for Respondents 34. At oral argument, respondents' counsel stressed this point, arguing that respondents' interpretation of §1608(a)(3) "gives effect" to the "familiar" due process standard articulated in *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306 (1950), which is "the notion that [service] must be reasonably calculated to give notice." Tr. of Oral Arg. 37–38.

This argument runs up against two well-settled principles of statutory interpretation. First, "Congress generally acts intentionally when it uses particular language in one

section of a statute but omits it in another." *Department of Homeland Security* v. *MacLean*, 574 U. S. \_\_\_, \_\_\_ (2015) (slip op., at 7). Because Congress included the "reasonably calculated to give actual notice" language only in §1608(b), and not in §1608(a), we resist the suggestion to read that language into §1608(a). Second, "we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U. S. 825, 837 (1988). Here, respondents encounter a superfluity problem when they argue that the "addressed and dispatched" clause in §1608(a)(3) gives effect to the *Mullane* due process standard. They fail to account for the fact that §1608(b)(3)(B) contains *both* the "addressed and dispatched" and "reasonably calculated to give actual notice" requirements. If respondents were correct that "addressed and dispatched" means "reasonably calculated to give notice," then the phrase "reasonably calculated to give actual notice" in §1608(b)(3) would be superfluous. Thus, as the dissent agrees, §1608(a)(3) "does not deem a foreign state properly served solely because the service method is reasonably calculated to provide actual notice." *Post,* at 2 (opinion of THOMAS, J.).

2

Section 1608(b)(2) similarly supports our interpretation of §1608(a)(3). Section 1608(b)(2) provides for delivery of a service packet to an officer or a managing or general agent of the agency or instrumentality of a foreign state or "to any other agent authorized by appointment or by law to receive service of process in the United States."

This language is significant for three reasons. First, it expressly allows service on an agent. Second, it specifies the particular individuals who are permitted to be served as agents of the recipient. Third, it makes clear that service on the agent may occur *in the United States* if an

agent here falls within the provision's terms.

If Congress had contemplated anything similar under §1608(a)(3), there is no apparent reason why it would not have included in that provision terms similar to those in §1608(b)(2). Respondents would have us believe that Congress was content to have the courts read such terms into §1608(a)(3). In view of §1608(b)(2), this seems unlikely.[2] See also *post,* at 2 ("Nor does the FSIA authorize service on a foreign state by utilizing an agent designated to receive process for the state").

3

Section 1608(c) further buttresses our reading of §1608(a)(3). Section 1608(c) sets out the rules for determining when service "shall be deemed to have been made." For the first three methods of service under §1608(a), service is deemed to have occurred on the date indicated on "the certification, signed and returned postal receipt, or other proof of service applicable to the method of service employed." §1608(c)(2). The sole exception is service under §1608(a)(4), which requires the Secretary of State to transmit a service packet to the foreign state through diplomatic channels. Under this method, once the Secretary has transmitted the packet, the Secretary must send to the clerk of the court "a certified copy of the diplomatic note indicating when the papers were transmitted." §1608(a)(4). And when service is effected in this way, service is regarded as having occurred on the transmittal date shown on the certified copy of the diplomatic note. §1608(c)(1).

_____

[2] Notably, the idea of treating someone at a foreign state's embassy as an agent for purposes of service on the foreign state was not unfamiliar to Congress. An earlier proposed version of the FSIA would have permitted service on a foreign state by sending the service packet "to the ambassador or chief of mission of the foreign state." See S. 566, 93d Cong., 1st Sess., §1608, p. 6 (1973).

Under all these methods, service is deemed to have occurred only when there is a strong basis for concluding that the service packet will very shortly thereafter come into the hands of a foreign official who will know what needs to be done. Under §1608(a)(4), where service is transmitted by the Secretary of State through diplomatic channels, there is presumably good reason to believe that the service packet will quickly come to the attention of a high-level foreign official, and thus service is regarded as having been completed on the date of transmittal. And under §§1608(a)(1), (2), and (3), where service is deemed to have occurred on the date shown on a document signed by the person who received it from the carrier, Congress presumably thought that the individuals who signed for the service packet could be trusted to ensure that the service packet is handled properly and expeditiously.

It is easy to see why Congress could take that view with respect to a person designated for the receipt of process in a "special arrangement for service between the plaintiff and the foreign state or political subdivision," §1608(a)(1), and a person so designated under "an applicable international convention," §1608(a)(2). But what about §1608(a)(3), the provision now before us? Who is more comparable to those who sign for mail under §§1608(a)(1) and (2)? A person who works in the office of the foreign minister in the minister's home country and is authorized to receive and process the minister's mail? Or a mailroom employee in a foreign embassy? We think the answer is obvious, and therefore interpreting §1608(a)(3) to require that a service packet be sent to a foreign minister's own office better harmonizes the rules for determining when service is deemed to have been made.

Respondents seek to soften the blow of an untimely delivery to the minister by noting that the foreign state can try to vacate a default judgment under Federal Rule of Civil Procedure 55(c). Brief for Respondents 27. But that

is a poor substitute for sure and timely receipt of service, since a foreign state would have to show "good cause" to vacate the judgment under that Rule. Here, as with the previously mentioned provisions in §1608, giving §1608(a)(3) its ordinary meaning better harmonizes the various provisions in §1608 and avoids the oddities that respondents' interpretation would create.

## C

The ordinary meaning of the "addressed and dispatched" requirement in §1608(a)(3) also has the virtue of avoiding potential tension with the Federal Rules of Civil Procedure and the Vienna Convention on Diplomatic Relations.

## 1

Take the Federal Rules of Civil Procedure first. At the time of the FSIA's enactment, Rule 4(i), entitled "Alternative provisions for service in a foreign-country," set out certain permissible methods of service on "part[ies] in a foreign country." Fed. Rule Civ. Proc. 4(i)(1) (1976). One such method was "by any form of mail, requiring a signed receipt, to be addressed and dispatched by the clerk of the court *to the party to be served*." Rule 4(i)(1)(D) (emphasis added). Rule 4(i)(2) further provided that "proof of service" pursuant to that method "shall include a receipt *signed by the addressee* or other evidence of *delivery to the addressee* satisfactory to the court." (Emphasis added.) The current version of Rule 4 is similar. See Rules 4(f)(2)(C)(ii), 4(*l*)(2)(B).

The virtually identical methods of service outlined in Rule 4 and §1608(a)(3) pose a problem for respondents' position: If mailing a service packet to a foreign state's embassy in the United States were sufficient for purposes of §1608(a)(3), then it would appear to be easier to serve the foreign state than to serve a person in that foreign state. This is so because a receipt signed by an embassy

employee would not necessarily satisfy Rule 4 since such a receipt would not bear the signature of the foreign minister and might not constitute evidence that is sufficient to show that the service packet had actually been delivered to the minister. It would be an odd state of affairs for a foreign state's inhabitants to enjoy more protections in federal courts than the foreign state itself, particularly given that the foreign state's immunity from suit is at stake. The natural reading of §1608(a)(3) avoids that oddity.

2

Our interpretation of §1608(a)(3) avoids concerns regarding the United States' obligations under the Vienna Convention on Diplomatic Relations. We have previously noted that the State Department "helped to draft the FSIA's language," and we therefore pay "special attention" to the Department's views on sovereign immunity. *Bolivarian Republic of Venezuela* v. *Helmerich & Payne Int'l Drilling Co.*, 581 U. S. ___, ___ (2017) (slip op., at 9). It is also "well settled that the Executive Branch's interpretation of a treaty 'is entitled to great weight.'" *Abbott* v. *Abbott*, 560 U. S. 1, 15 (2010) (quoting *Sumitomo Shoji America, Inc.* v. *Avagliano*, 457 U. S. 176, 185 (1982)).

Article 22(1) of the Vienna Convention provides: "The premises of the mission shall be inviolable. The agents of the receiving State may not enter them, except with the consent of the head of the mission." Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U. S. T. 3237, T. I. A. S. No. 7502. Since at least 1974, the State Department has taken the position that Article 22(1)'s principle of inviolability precludes serving a foreign state by mailing process to the foreign state's embassy in the United States. See Service of Legal Process by Mail on Foreign Governments in the United States, 71 Dept. State Bull. 458–459 (1974). In this case, the State Department has

reiterated this view in *amicus curiae* briefs filed in this Court and in the Second Circuit. The Government also informs us that United States embassies do not accept service of process when the United States is sued in a foreign court, and the Government expresses concern that accepting respondents' interpretation of §1608 might imperil this practice. Brief for United States as *Amicus Curiae* 25–26.

Contending that the State Department held a different view of Article 22(1) before 1974, respondents argue that the Department's interpretation of the Vienna Convention is wrong, but we need not decide this question. By giving §1608(a)(3) its most natural reading, we avoid the potential international implications of a contrary interpretation.

## III

Respondents' remaining arguments do not alter our conclusion. First, respondents contend that §1608(a)(3) says nothing about where the service packet must be sent. See Brief for Respondents 22 ("the statute is silent as to the location *where* the service packet should be sent"). But while it is true that §1608(a)(3) does not expressly provide where service must be sent, it is common ground that this provision must implicitly impose some requirement. Respondents acknowledge this when they argue that the provision demands that service be sent "to a location that is likely to have a direct line of communication to the foreign minister." *Id.,* at 34; cf. *post,* at 6 (stating that sending a letter to a Washington-based embassy "with a direct line of communication" to the foreign minister seems as efficient as sending it to the minister's office in the foreign state). The question, then, is precisely what §1608(a)(3) implicitly requires. Respondents assure us that a packet sent to "an embassy plainly would qualify," while a packet sent to "a tourism office plainly would not." Brief for Respondents 34. But if the test is whether "a

location . . . is likely to have a direct line of communication to the foreign minister," *ibid.*, it is not at all clear why service could not be sent to places in the United States other than a foreign state's embassy. Why not allow the packet to be sent, for example, to a consulate? The residence of the foreign state's ambassador? The foreign state's mission to the United Nations? Would the answer depend on the size or presumed expertise of the staff at the delivery location? The difficult line-drawing problems that flow from respondents' interpretation of §1608(a)(3) counsel in favor of maintaining a clear, administrable rule: The service packet must be mailed directly to the foreign minister at the minister's office in the foreign state.

Second, respondents (and the dissent, see *post,* at 5–6) contrast the language of §1608(a)(3) with that of §1608(a)(4), which says that service by this method requires that process be sent to the Secretary of State in "Washington, District of Columbia." If Congress wanted to require that process under §1608(a)(3) be sent to a foreign minister's office in the minister's home country, respondents ask, why didn't Congress use a formulation similar to that in §1608(a)(4)? This is respondents' strongest argument, and in the end, we see no entirely satisfactory response other than that §1608(a) does not represent an example of perfect draftsmanship. We grant that the argument based on the contrasting language in §1608(a)(4) cuts in respondents' favor, but it is outweighed in our judgment by the countervailing arguments already noted.

Finally, respondents contend that it would be "the height of unfairness to throw out [their] judgment" based on the highly technical argument belatedly raised by petitioner. See Brief for Respondents 35. We understand respondents' exasperation and recognize that enforcing compliance with §1608(a)(3) may seem like an empty formality in this particular case, which involves highly

publicized litigation of which the Government of Sudan may have been aware prior to entry of default judgment. But there are circumstances in which the rule of law demands adherence to strict requirements even when the equities of a particular case may seem to point in the opposite direction. The service rules set out in §1608(a)(3), which apply to a category of cases with sensitive diplomatic implications, clearly fall into this category. Under those rules, all cases must be treated the same.

Moreover, as respondents' counsel acknowledged at oral argument, holding that Sudan was not properly served under §1608(a)(3) is not the end of the road. Tr. of Oral Arg. 56. Respondents may attempt service once again under §1608(a)(3), and if that attempt fails, they may turn to §1608(a)(4). When asked at argument to provide examples of any problems with service under §1608(a)(4), respondents' counsel stated that he was unaware of any cases where such service failed. *Id.,* at 59–62.

\*  \*  \*

We interpret §1608(a)(3) as it is most naturally understood: A service packet must be addressed and dispatched to the foreign minister at the minister's office in the foreign state. We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

＿＿＿＿＿＿

No. 16–1094

＿＿＿＿＿＿

## REPUBLIC OF SUDAN, PETITIONER *v.*
## RICK HARRISON, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[March 26, 2019]

JUSTICE THOMAS, dissenting.

The Court holds that service on a foreign state by certified mail under the Foreign Sovereign Immunities Act (FSIA) is defective unless the packet is "addressed and dispatched to the foreign minister *at the minister's office in the foreign state.*" *Ante*, at 17 (emphasis added). This bright-line rule may be attractive from a policy perspective, but the FSIA neither specifies nor precludes the use of any particular address. Instead, the statute requires only that the packet be sent to a particular person—"the head of the ministry of foreign affairs." 28 U. S. C. §1608(a)(3).

Given the unique role that embassies play in facilitating communications between states, a foreign state's embassy in Washington, D. C., is, absent an indication to the contrary, a place where a U. S. litigant can serve the state's foreign minister. Because there is no evidence in this case suggesting that Sudan's Embassy declined the service packet addressed to its foreign minister—as it was free to do—I would hold that respondents complied with the FSIA when they addressed and dispatched a service packet to Sudan's Minister of Foreign Affairs at Sudan's Embassy in Washington, D. C. Accordingly, I respectfully dissent.

## I

To serve a foreign state by certified mail under the FSIA, the service packet must be "addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Ibid.* In many respects, I approach this statutory text in the same way as the Court. I have no quarrel with the majority's definitions of the relevant statutory terms, *ante,* at 6–7, and I agree that the FSIA does not deem a foreign state properly served solely because the service method is reasonably calculated to provide actual notice, *ante,* at 9–10, 15–16. Nor does the FSIA authorize service on a foreign state by utilizing an agent designated to receive process for the state. *Ante,* at 10–11. At the same time, the FSIA stops short of requiring that the foreign minister personally receive or sign for the service packet: As long as the service packet is "addressed and dispatched . . . to" the foreign minister, §1608(a)(3), the minister's subordinates may accept the packet and act appropriately on his behalf. *Ante,* at 8.

In short, I agree with the majority that §1608(a)(3) requires that the service packet be dispatched to an address for the foreign minister. The relevant question, in my view, is whether a foreign state's embassy in the United States can serve as a place where the minister of foreign affairs may be reached by mail. Unlike the majority, I conclude that it can.

## II

A foreign state's embassy in Washington, D. C., is generally a place where a U. S. court can communicate by mail with the state's foreign minister. Unless an embassy decides to decline packages containing judicial summonses— as it is free to do, both in individual cases or as a broader policy—a service packet addressed and dispatched to a foreign minister at the address of its embassy in the

United States satisfies §1608(a)(3).

Because embassies are "responsible for state-to-state relationships," Malone, The Modern Diplomatic Mission, in The Oxford Handbook of Modern Diplomacy 124 (A. Cooper, J. Heine, & R. Thakur eds. 2013), an important function of an embassy or other "diplomatic mission" is to "act as a permanent channel of communication between the sending state and the receiving state." G. Berridge & A. James, A Dictionary of Diplomacy 73 (2d ed. 2003). Embassies fulfill this function in numerous ways, including by using secure faxes, e-mails, or the "diplomatic bag" to transmit documents to the states they represent. A. Aust, Handbook of International Law 122 (2d ed. 2010); see *ibid.* (the diplomatic bag is a mailbag or freight container containing diplomatic documents or articles intended for official use). Thus, as one *amicus* brief aptly puts it, embassies "have direct lines of communications with the home country, and a pipeline to route communications to the proper offices and officials." Brief for Former U. S. Counterterrorism Officials et al. as *Amici Curiae* 29.

Numerous provisions of the Vienna Convention on Diplomatic Relations (VCDR) confirm this reality, Apr. 18, 1961, 23 U. S. T. 3227, T. I. A. S. No. 7502. Under the VCDR, an embassy "may employ all appropriate means" of communicating with the state whose interests it represents, Art. 27(1), including "modern means of communication such as (mobile) telecommunication, fax, and email," Wouters, Duquet, & Meuwissen, The Vienna Conventions on Diplomatic and Consular Relations, in The Oxford Handbook of Modern Diplomacy, *supra*, at 523. The VCDR provides substantial protections for the "official correspondence of the mission" and the diplomatic bag, which may include "diplomatic documents or articles intended for official use." Arts. 27(1)–(5); cf. Vienna Convention on Consular Relations, Arts. 3, 5(j), 35, Apr. 24, 1963, 21 U. S. T. 77, T. I. A. S. No. 6820 (recognizing that

embassies may perform "[c]onsular functions," such as "transmitting judicial and extrajudicial documents," and affording protections to official communications).

The capability of an embassy to route service papers to the sending state is confirmed by the State Department regulation implementing §1608(a)(4), which provides for service on the foreign state through diplomatic channels. Under this regulation, the Department may deliver the service packet "to the embassy of the foreign state in the District of Columbia" "[i]f the foreign state so requests or if otherwise appropriate." 22 CFR §93.1(c)(2) (2018). Although the service packet under §1608(a)(4) need not be addressed and dispatched to the foreign minister, the regulation implementing it nevertheless demonstrates that embassies do in fact provide a channel of communication between the United States and foreign countries.

It was against this backdrop that respondents requested that their service packet be "addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of [Sudan]," §1608(a)(3), at the address of its embassy in Washington, D. C. Because an embassy serves as a channel through which the U. S. Government can communicate with the sending state's minister of foreign affairs, this method of service complied with the ordinary meaning of §1608(a)(3) on this record. There is—and this is critical—no evidence in the record showing that Sudan's foreign minister could not be reached through the embassy. As the majority acknowledges, the clerk received a signed return receipt and a shipping confirmation stating that the package had been delivered. *Ante,* at 3. Nothing on the receipt or confirmation indicated that the package could not be delivered to its addressee, and both the clerk and the District Judge determined that service had been properly effectuated.

Of course, the FSIA does not impose a substantive obligation on the embassy to accept or transmit service of

process directed to the attention of the foreign minister. A foreign state and its embassy are free to reject some or all packets addressed to the attention of the foreign minister. But, as detailed above, Sudan has pointed to nothing in the record suggesting that its embassy refused service, or that its embassy address was not a place at which its foreign minister could be reached. On these facts, I would hold that the service packet was properly "addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs." §1608(a)(3).

## III
## A

Instead of focusing on whether service at an embassy satisfies the FSIA, the Court articulates a bright-line rule: To comply with §1608(a)(3), "[a] service packet must be addressed and dispatched to the foreign minister *at the minister's office in the foreign state*." *Ante,* at 17 (emphasis added). Whatever virtues this rule possesses, the Court's interpretation is not the "most natural reading" of §1608(a)(3), *ante,* at 6.

The Court focuses on the foreign minister's "customary office" or "place of work," *ante,* at 9, 7, but these terms appear nowhere in §1608. The FSIA requires that the service packet be "addressed and dispatched" to a particular *person*—"the head of the ministry of foreign affairs." §1608(a)(3). It does not further require that the package be addressed and dispatched to any particular *place*. While I agree with the Court that sending the service packet to the foreign ministry is one way to satisfy §1608(a)(3), that is different from saying that §1608(a)(3) requires service exclusively at that location.

The absence of a textual foundation for the majority's rule is only accentuated when §1608(a)(3) is compared to §1608(a)(4), the adjacent paragraph governing service through diplomatic channels. Under that provision, the

service packet must be "addressed and dispatched by the clerk of the court to the Secretary of State *in Washington, District of Columbia*, to the attention of the Director of Special Consular Services." §1608(a)(4) (emphasis added); see 22 CFR §93.1(c) (State Department regulation governing service under this provision). Unlike §1608(a)(3), this provision specifies both the person to be served *and* the location of service. While not dispositive, the absence of a similar limitation in §1608(a)(3) undermines the categorical rule adopted by the Court.

The Court offers three additional arguments in support of its position, but none justifies its bright-line rule.

First, the Court offers a series of hypotheticals to suggest that the term "dispatched" not only contemplates a prompt shipment, but also connotes sending the letter directly to a place where the person is likely to be physically located. *Ante,* at 7–8. In my opinion, these hypotheticals are inapt. The unique role of an embassy in facilitating communications between sovereign governments does not have an analog in the hypotheticals offered by the majority.[1] And to the extent the statute emphasizes speed and directness, as the majority suggests, dispatching a letter to a Washington-based embassy with a direct line of communication to the foreign minister—including the ability to communicate electronically—seems at least as efficient as dispatching the letter across the globe to a foreign country, particularly if that country has recently

———————

[1] To the extent the relationship between a U. S. Attorney's office and the Attorney General is analogous, the majority correctly acknowledges that the office would "very probably forward" a letter directed to the attention of the Attorney General. *Ante*, at 8. The majority nevertheless believes that it would be improper or unusual to dispatch that letter to a local U. S. Attorney's office. I disagree. It seems entirely likely that a person residing in the District of Idaho would dispatch a letter to the Attorney General through the U. S. Attorney's office serving his District—even if it would be odd for a resident of the District of Columbia to use that Idaho address.

experienced armed conflict or political instability.

Second, the Court notes that, under its rule, the effective date of service under §1608(c) will be closer in time to when the service packet reaches a foreign official who knows how to respond to the summons. *Ante*, at 11–12. That contention assumes embassy employees are less capable of responding to a summons than foreign-ministry employees. But even granting that premise, this argument falls short. An embassy is capable of quickly transmitting a summons to the foreign minister, whether electronically, by diplomatic bag, or by some other means. Any time lost in transmission is not significant enough to warrant the Court's departure from the text of the statute.

Third, the Court argues that allowing service at the embassy would make it easier to serve a foreign state than it is to serve a person in that foreign state under Federal Rule of Civil Procedure 4. *Ante,* at 13–14. I am not persuaded. Under the FSIA, service by mail is not effective until "the date of receipt indicated in the . . . signed and returned postal receipt." §1608(c)(2). That is no more generous than practice under Rule 4, especially since the foreign minister need not accept service. To the extent that embassies accept service of process directed to the foreign minister, it is that decision that eases the burden on the plaintiff, not §1608(a)(3).

B

Sudan also argues that allowing service by mail at an embassy would violate Article 22(1) of the VCDR. The Court does not adopt Sudan's argument, stating only that its decision has "the virtue of avoiding potential tension" with the VCDR. *Ante,* at 13. But there is no tension between my reading of the FSIA and the VCDR.[2]

───────────

[2] Even if there were, the FSIA postdates the VCDR and thus "'renders the treaty null'" "'to the extent of conflict.'" *Breard* v. *Greene*, 523 U. S. 371, 376 (1998) (*per curiam*) (quoting *Reid* v. *Covert*, 354 U. S. 1,

Article 22(1) of the VCDR provides that the premises of the mission—that is, "the buildings or parts of buildings and the land ancillary thereto . . . used for the purposes of the mission," Art. 1(i)—"shall be inviolable."  The VCDR consistently uses the word "inviolable" to protect against physical intrusions and similar types of interference, not the jurisdiction of a court.  The concept of "inviolability" is used, for instance, to protect the mission's "premises," Art. 22(1); the "archives and documents of the mission," Art. 24; the "official correspondence of the mission," Art. 27(2); the "private residence of a diplomatic agent," Art. 30(1); and the diplomatic agent's "person," "papers, correspondence, and," with certain exceptions, "his property," Arts. 29, 30(2).

The provisions of the VCDR that protect against assertions of jurisdiction, by contrast, speak in terms of "immunity."  Thus, in addition to physical inviolability, the premises of the mission (and "other property thereon") are separately "immune from search, requisition, attachment or execution."  Art. 22(3).  And a diplomatic agent is separately "immun[e] from the criminal jurisdiction of the receiving State" and, generally, from "its civil and administrative jurisdiction."  Art. 31(1).  Several provisions of the VCDR distinguish between "immunity from jurisdiction, and inviolability."  Art. 38(1); see Arts. 31(1), (3).

Given the VCDR's consistent use of "inviolability" to protect against physical intrusions and interference, and "immunity" to protect against judicial authority, Article 22(1)'s protection of the mission premises is best understood as a protection against the former.  Thus, under the VCDR, the inviolability of the embassy's premises is not implicated by receipt of service papers to any greater degree than it is by receipt of other mail.  Cf. *Reyes* v. *Al-Malki*, [2017] UKSC 61, ¶16 (holding that service via mail

————
18 (1957) (plurality opinion)).

at the diplomatic residence—which is afforded the same level of protection as the mission premises under Article 30(1)—does not violate the VCDR).

\*    \*    \*

Because the method of service employed by respondents here complied with the FSIA, I would affirm the judgment of the Second Circuit.